# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ENVIRONMENTAL DIMENSIONS, INC.,

    Plaintiff,

v.                                                                                No. 1:16-cv-1056-KWR-JHR

ENERGYSOLUTIONS GOVERNMENT
GROUP, INC. (n/k/a Atkins Energy
Government Group, Inc.),

    Defendant.

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**THIS MATTER** is before the Court on Defendant's Motion for partial Summary Judgment on Plaintiff's Unfair Trade Practices Act claim [Doc. 103], filed November 21, 2018. Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendant's motion is well-taken and, therefore, is **GRANTED**.

## BACKGROUND

This action arises from a dispute involving a nuclear waste remediation project the parties worked on together at Los Alamos National Lab ("LANL"). Plaintiff is in the business of providing environmental resources and radioactive waste management and containment support to the U.S. Department of Energy and other government agencies. The company is managed predominately by its Vice President, Michael Bradshaw ("Bradshaw"). Plaintiff engaged in a bidding process for qualification to contract with Los Alamos National Security, LLC ("LANS") to perform transuranic waste remediation work at LANL.

### Defendant's LANS Contract: Master Task Order 10

Defendant provides nuclear waste remediation and personnel support. In 2009, two years

before contracting with Plaintiff, Defendant worked as prime contractor with LANS on a transuranic waste remediation project designated as Master Task Order 10. The project was completed on June 30, 2014. Plaintiff was not a party to that agreement. On February 14, 2014, an incident occurred at the Carlsbad Waste Isolation Pilot Plant facility when an improperly packaged waste drum, packaged by Defendant at LANL, underwent an exothermic reaction and burst, causing a radiological release ("WIPP incident"). The DOE Accident Investigation Board (AIB) investigated the incident and issued a report on April 15, 2015. The report pinpointed twelve contributing factors leading to the accident, including, among other things, LANS' failure to adhere to certain controls implemented by the relevant field office, LANL's failure to develop appropriate packaging and treatment procedures, and failure of LANS, Defendant, and the Los Alamos field office to ensure a strong enough safety culture. The report stated that Defendant's actions were possible contributing factors to the accident but stated that none of the contributing factors individually caused the accident.[1]

<u>Master Task Order Agreement No. 2</u>

Unrelated to Defendant's Master Task Order 10 project, on July 12, 2011, in pursuit of qualification to bid on a LANL contract for small businesses, denominated as Master Task Order Agreement No. 2 ("MTOA2"), Plaintiff executed a Teaming Agreement with Defendant, specifying the duties and responsibilities of the parties should the bid be accepted. The Agreement included that, "[e]xcept as expressly provided … all rights and obligations of the parties under this Agreement shall terminate on the earliest of the following: … e. Execution by both parties of the subcontract contemplated by this Agreement." (Doc. 99 Ex. G).

---

[1] The Report provides "Contributing Causes: Events or conditions that collectively with other causes increased the likelihood or severity of an accident but that individually did not cause the accident." (Doc. 111 Ex. 1 Page 4).

In February 2012, Plaintiff was qualified as a potential contractor, but no work was assigned at the time. The LANS' MTOA2 agreement with Plaintiff provided that "Contractor [LANS] may, at any time, without notice to the sureties if any, by written Change Notice unilaterally direct additions, deletions or changes . . . to all or any part of the Work and Subcontractor agrees to perform such work as changed." (SOF 7).

After its successful qualification, Plaintiff subcontracted with Defendant and two other companies to carry out assigned work. Plaintiff executed the subcontract with Defendant in August 2013. On April 16, 2014, LANS awarded Plaintiff work under MTOA2 Task Order 1, with a maximum potential allocation of $23,349,876.42. LANS retained the right to modify this amount. LANS incrementally released funds for the project to Plaintiff amounting to $4,839,421.76. Work began on the project in July 2014.

Plaintiff's employees, project manager Chris Edgmon ("Edgmon") and COO/VP of business development John Rodell ("Rodell")[2] were tasked with coordinating the work. Edgmon was responsible for managing the project on a day-to-day basis by scheduling work, budgeting, and approving invoices submitted by the subcontractors, which in turn were submitted to Rodell for review and approval. Bradshaw had little involvement in the day-to-day operations of the project, and most decisions were largely left to Edgmon and Rodell.

Defendant took on a larger role than the other subcontractors in performance of the work, consequently billing for a larger share than the other subcontractors. It is undisputed that Defendant only carried out work authorized by Plaintiff; that Defendant submitted six invoices dating from March 10 - August 11, 2015 amounting to $1,057,354.63, for which it was not paid; and that Plaintiff submitted invoices to LANS for the same work and received payment. On May

---

[2] It is unclear what Rodell's exact title is, but the record reflects that Edgmon deferred to him and he made final decisions regarding the project on a day-to-day basis.

3

12, 2015, Bradshaw sent a letter of cure to Defendant stating Defendant was not in compliance with the terms of the Teaming Agreement and that "[i]n spite of repeated attempts by EDi to realign the staffing to meet the TA [Teaming Agreement] goals, Energy*Solutions* continued refusal has forced us to take action… [i]f this matter is not resolved by Friday May 15, 2015, any work [going forward] performed by Energy*Solutions* above and beyond 35% is done so solely at Energy*Solutions'* risk." (Doc. 111 Ex. 2). After Bradshaw's letter, Plaintiff continued to assign work to Defendant, which it performed until LANS terminated the underlying Task Order by letter on May 27, 2015, stating that "[t]he TRU waste program has reduced the scope and budget for SSR activities this fiscal year and for the next two fiscal years. As a result, the current and long term scope included in EDi's Task Order 275074 will be removed in full with the exception of the warehousing leasing applicable to this removed scope of work." (SOF 16).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 922 F.3d 1033, 1036 (10th Cir. 1993) (citations omitted). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the nonmoving party. *EEOC v.*

*Horizon/CMS Heathcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

## DISCUSSION

### I. Preliminary Matter: Local Rule 7.1

For the same reasons advanced by the Court in its prior Memorandum Opinion and Order (Doc. 155), the Court rejects Plaintiff's argument that summary judgment should be denied due to Defendant's alleged procedural violation of Local Rule 7.1 for failure to confer with Plaintiff prior to submission of this motion.

### II. Unfair Trade Practices Act

#### A. Parties' Assertions

Plaintiff claims that Defendant violated the New Mexico Unfair Trade Practices Act (UPA), alleging that through "discussions and meetings" Defendant was aware of issues with its waste packaging procedures as early as September 2011, but failed to inform Plaintiff of possible negative outcomes associated with these problems; that Plaintiff did not disclose the extent of Defendant's involvement in the WIPP incident after executing the Teaming Agreement; that Defendant breached its duty under the Teaming Agreement in failing to keep Plaintiff apprised of the ongoing investigation; and that it concealed Defendant's potential liability for over a year

5

before MTOA2 Task Order 1 was terminated. Plaintiff attributes LANS' choice to perform more work internally as a punitive measure in response to Defendant's alleged misconduct during the WIPP incident. Lastly, Plaintiff states that Defendant used "heavy-handed tactics" and "overruled" Plaintiff's managerial staff to manipulate the contract to monopolize work to the exclusion of the other subcontractors.

Defendant asserts, *inter alia*, that Plaintiff does not establish the requisite elements of a claim under the UPA, particularly because Defendant could not have known or warned Plaintiff of any issues, before executing the Teaming Agreement, since the WIPP incident occurred after Plaintiff and Defendant's agreement; that Defendant did not conceal or misrepresent its involvement in the WIPP incident, but rather kept Plaintiff informed of the proceedings; that LANS had the power to reduce or terminate the work as it saw fit and chose to exercise the option without regard to Defendant's involvement in the WIPP incident; and, that Defendant only performed work it was authorized to do.

B. **Analysis**

The Court is unconvinced that Plaintiff has demonstrated a violation under the UPA. Plaintiff has not pointed to cognizable evidence that Defendant misrepresented or obscured its involvement in the WIPP incident. Nor has Plaintiff shown that LANS terminated the contract due to Defendant's work on Task Order 10, or that Defendant violated the Teaming Agreement in performing a larger share of the work on MTOA2 than the other subcontractors.

1. **Law Regarding The Unfair Trade Practices Act**

"The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices." *Bhasker v. Kemper Cas. Ins. Co.*, 361 F. Supp. 3d 1045, 1136–37 (D.N.M. 2019). Generally, the UPA is designed to protect from "misleading identification and

false or deceptive advertising." *Id.* (citing *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 22, 166 P.3d 1091, 1096). In *Dollens v. Wells Fargo Bank, N.A.* (2015-NMCA-096, ¶ 14, 356 P.3d 531, 537), the Court provided that establishing a successful claim under the UPA requires a showing that

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person. (internal citations omitted).

*See Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 13, 811 P.2d 1308, 1311; *Eisert v. Archdiocese of Santa Fe*, 2009-NMCA-042, ¶ 26, 207 P.3d 1156, 1164.

### 2. **The WIPP Facility Incident**

Plaintiff claims that Defendant violated the UPA and breached the terms of the Teaming Agreement by misrepresenting the extent of its involvement in the WIPP incident, and that it knew as early as September 2011 that there were issues with its packaging procedures. Plaintiff points to the determinations of the AIB Report as the evidentiary basis for these contentions. Plaintiff's reliance upon the results of AIB report is misplaced; there is nothing within that indicates Defendant engaged in discussions regarding improper packaging as early as September 2011, or that it knew or should have known of packaging issues.

The Court finds Plaintiff's argument unavailing that Defendant should have notified Plaintiff of alleged misconduct during its earlier work for LANL, prior to entering into an agreement with Plaintiff, given the timing of the WIPP incident, which occurred on February 14, 2014, approximately three years after the parties entered into the Teaming Agreement and six months after the subcontract. Plaintiff has not shown that Defendant misrepresented its involvement in waste packaging procedures leading to the WIPP incident prior to signing the

7

Teaming Agreement. Plaintiff's employees directly involved with the MTOA2 project testified that no misrepresentations were made by Defendant at the time of entering into the Teaming Agreement or the subcontract, and that Defendant did not attempt to obscure its involvement after the WIPP incident but was in fact cooperative. (SOF 27-28). Edgmon confirmed that the parties maintained open dialogue regarding the ongoing investigation. (Doc 99. Ex. C 193:6-18). Moreover, Edgmon and Rodell both testified that Defendant offered to withdraw as subcontractor following the WIPP incident to avoid potential complications for Plaintiff (SOF 29-30). Plaintiff's conclusory denials in its Opposition do not point to contradictory facts. Plaintiff's opposition, arguing that Defendant may have offered to withdraw to Rodell but not to anyone with authority at EDi is disingenuous since Rodell was designated by Bradshaw as the authority on all day-to-day aspects of the project. (Doc. 99 Ex. A 22:4-12).

The record is devoid of evidence of misleading statements made by Defendant or misrepresentations regarding its involvement in the WIPP incident that would tend to mislead Plaintiff, as would be required under the UPA. Plaintiff's assertion that Defendant knew of potential liability over a year before MTOA2 Task Order 1 was terminated is equally unsupported. *See Sinfuego v. Curry County Bd. of County Commissioners*, 360 F. Supp. 3d 1177, 1225 (D.N.M. 2018) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). The section of the AIB report Plaintiff relies upon does not stand for this proposition but rather highlights the timeline and scope of AIB's investigation (Doc. 111 Ex. 3). For the foregoing reasons, Plaintiff has not established the elements of a violation under the UPA, and summary judgment is warranted.

### 3. LANS Decision to Self-Perform Work

Plaintiff admits that LANS decided to self-perform much of the contemplated work (SOF 15) but claims LANS elected to do so, and ultimately terminated the MTOA2 contract, because of dissatisfaction with Defendant's performance on Master Task Order 10. In support, Plaintiff refers the Court to Exhibit 2, which is Bradshaw's letter of cure sent to Defendant on May 12, 2015. This letter is wholly unrelated to LANS termination of the project work. Presuming Plaintiff intended to direct the Court to LANS' May 27, 2015 letter of termination, nothing therein indicates the decision was in retribution for Defendant's prior work, and a subsequent letter from LANS to the Plaintiff's President categorically denies this assertion. (Doc. 99 Ex. Y, Z). Additionally, both Edgmon and Rodell testified that LANS personnel informed them that Defendant was not an issue. (Doc. 99 Ex. C 146:16-25, 147: 10-14; Ex. D 197:8-25-198:1). Plaintiff's subsequent attempt in its Opposition to qualify its employees' testimony again inappositely points to Exhibit 2, Bradshaw's unrelated May 12 letter of cure.

Plaintiff next seeks to refute Defendant's contention that it was not guaranteed any work under the contract. However, the "Additional Material Facts" Plaintiff relies upon in its Opposition do not reference this issue at all, and is contrary to Plaintiff's admission that LANS had authority to make changes and reductions to any allocation of work or funds under the contract at any time (SOF 7), as well as Rodell's testimony to that effect (Doc. 99 Ex. D 208:2-21).

### 4. Defendant's Share of Labor

Plaintiff's claim that Defendant breached a duty under the UPA by monopolizing the work to the exclusion of other subcontractors has no basis under the statute and is also rebutted by a plain reading of the Teaming Agreement. As an initial matter, the terms of the Teaming Agreement expressly state that it terminates upon signing of the subcontract (Doc. 99 Ex. G). Regardless,

both the Teaming Agreement and subcontract provide that Defendant is entitled to "a minimum of 35% of the labor." Plaintiff repeatedly acknowledges that the 35% was a minimum threshold guarantee (Doc. 99 Ex. C 77:22-78:1; Ex. A 69:3–9, 69:20–70:2) but argues that Defendant utilized heavy-handed tactics, overruled management and refused to transfer employees to reallocate the work between the subcontractors. Plaintiff also states that Bradshaw's letter was effectively a stop work order, and Defendant did not stop working or transfer employees as directed.

Plaintiff fails to bolster these allegations with any supporting contract provision or other evidence. Vague, conclusory statements that Defendant employed heavy-handed tactics are insufficient to defeat a motion for summary judgment. *See Langley v. Adams Cty., Colo.*, 987 F.2d 1473 (10th Cir. 1993) (nonmovant "must identify sufficient evidence which would require submission of the case to a jury"; *Elephant Butte Irr. Dist. of New Mexico v. U.S. Dept. of Interior*, 538 F.3d 1299, 1305 (10th Cir. 2008) (Fed.R.Civ.P.56 requires that party opposing motion for summary judgment must set out specific facts showing a genuine issue for trial). Additionally, Edgmon testified, and Bradshaw confirmed, that Defendant only performed work it was authorized to do. (Doc. 99 Ex. C 125:20–126:14; Ex. B 64:5–11).

Plaintiff proffers Bradshaw's letter and email communication between Rodell and Defendant's employee in which Defendant appears to resist requests to reduce or transfer additional staff. However, Edgmon testified that Defendant always complied with transfer requests (Doc. 99 Ex. C 157:17–22); Bradshaw acknowledged that Defendant was not contractually required to redistribute staff (Doc. 99 Ex. FF 71:16–73:6, 76:7–10); and, as previously stated, Plaintiff continued to assign work to Defendant after the letter (Doc. 99 Ex. C 154:4–25). Accordingly, Plaintiff has failed to establish essential elements of a violation under

the UPA or to demonstrate a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## CONCLUSION

Plaintiff's arguments are not borne out by the facts. Viewing the evidence in the light most favorable to Plaintiff, there are no genuine issues of material fact such that summary judgment should be denied.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 103) on Plaintiff's Unfair Trade Practices Act claim is hereby GRANTED.

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE