## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

ENVIRONMENTAL DIMENSIONS, INC.,

     Plaintiff,

v.                                        No. 1:16-cv-1056-KWR-JHR

ENERGYSOLUTIONS GOVERNMENT
GROUP, INC. (n/k/a Atkins Energy
Government Group, Inc.),

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court upon Defendant EnergySolutions Government Group, Inc.'s opposed Motion to Reconsider **(Doc. 169)**, filed February 25, 2020. The motion seeks reconsideration of Defendant's Motion for Summary Judgment on its Counterclaims, **(Doc. 98)**, which the Court denied on November 8, 2019, *see* **(Doc. 158)**. Having reviewed the parties' briefs, the evidence and applicable law, the Court finds that Defendant's motion is well taken and, therefore, is **GRANTED**.

## BACKGROUND[1]

These claims arise from a dispute involving a nuclear waste remediation project the parties worked on together at Los Alamos National Lab ("LANL"). Plaintiff is in the business of providing environmental resources and radioactive waste management and containment support to the U.S. Department of Energy and other government agencies. The company is managed predominately by its Vice President, Michael Bradshaw ("Bradshaw"). Plaintiff engaged in a

---

[1] The facts are taken from the parties' briefs as well as the Master Appendix submitted for consideration of this motion and are undisputed unless noted. *See* Doc. 99.

bidding process for qualification to contract with Los Alamos National Security, LLC ("LANS") to perform transuranic waste remediation work at LANL.  Defendant provides nuclear waste remediation and personnel support and worked with LANL previously on other projects.  Prior to submitting its bid, Plaintiff executed a Teaming Agreement with Defendant on July 12, 2011, specifying the duties and responsibilities of the parties should the bid be accepted.  The Agreement includes that, "[i]n any event, EnergySolutions' share will be a minimum of 35% of the total contract labor value earned in performance of the life cycle of the anticipated contract issued by LANS."  The Agreement contains an additional provision that "[e]xcept as expressly provided … all rights and obligations of the parties under this Agreement shall terminate on the earliest of the following: … e. Execution by both parties of the subcontract contemplated by this Agreement." (Doc. 99 Ex. G).

When Plaintiff was subsequently awarded the contract, denominated as Master Task Order Agreement 2 ("MTOA2"), it subcontracted with Defendant and two other companies to carry out the work.  Plaintiff executed the subcontract with Defendant in August 2013, which incorporated the language of the Teaming Agreement guaranteeing Defendant a 35% minimum share of the labor.  The subcontract further provided that "[p]ayments shall be issued to Subcontractor after receipt and approval of Subcontractor's invoices by EDi and within 10 days of receipt of payment from the [LANS]."

Through a series of modifications, Defendant was authorized to bill up to $3,500,000 for completed work[2].  At no time did Defendant exceed this amount. Work began on the project in July 2014.

---

[2] Plaintiff admits this fact (Doc. 98 SOF 21) to the extent that six modification were made. However it does not dispute the remainder as to the ceiling amount permitted for billing or provide evidence to the contrary and is therefore deemed admitted pursuant to Rule 56 (e)(2). Moreover, Plaintiff's employee's testimony corroborated this assertion. *See* Doc. 99 Ex. D 127:20-128:19.

Plaintiff's employees, project manager Chris Edgmon ("Edgmon") and COO/VP of business development John Rodell ("Rodell")[3] were tasked with coordinating the work on a day-to-day basis.  Edgmon was responsible for, among other things, scheduling work, budgeting, and approving invoices submitted by the subcontractors, which in turn were submitted to Rodell for review and approval.  Bradshaw had little involvement in the day-to-day operations of the project, and most decisions were largely left to Edgmon and Rodell.

Defendant took on a larger role than the other subcontractors in performance of the work, consequently billing for a larger share than the minimum 35% expressed in the Teaming Agreement and the subcontract.  It is undisputed that Defendant only carried out work authorized by Plaintiff; that Defendant submitted six invoices dating from March 10 - August 11, 2015 amounting to $1,057,354.63, for which it was not paid; and that Plaintiff submitted invoices to LANS for the same work and received payment.  On May 12, 2015, Bradshaw sent a letter of cure to Defendant stating it was not in compliance with the terms of the Teaming Agreement and that "[i]n spite of repeated attempts by EDi to realign the staffing to meet the TA [Teaming Agreement] goals, Energy*Solutions* continued refusal has forced us to take action… [i]f this matter is not resolved by Friday May 15, 2015, any work [going forward] performed by Energy*Solutions* above and beyond 35% is done so solely at Energy*Solutions'* risk." (Doc. 113 Ex. 2).  After Bradshaw's letter, Plaintiff continued to assign work to Defendant, which it performed until the underlying Task Order was terminated by LANS on May 27, 2015.

Plaintiff originally sued Defendant raising, among other claims, breach of contract and violation of New Mexico's Unfair Trade Practices Act. Plaintiff largely attributed LANS' choice to terminate the project and perform more work internally as a punitive measure in response to

---

[3] It is unclear what Rodell's exact title is, but the record reflects that Edgmon deferred to him and he made final decisions regarding the project on a day-to-day basis.

Defendant's alleged misconduct during the February 14, 2014 "WIPP incident," when an improperly packaged waste drum packaged by Defendant at LANL, while working on another project[4], underwent an exothermic reaction and burst, causing a radiological release.

**Plaintiff's Additional Facts[5]**

Plaintiff asserts that through "discussions and meetings" Defendant was aware of issues with its waste packaging procedures, in its prior project with LANL, as early as September 2011 but failed to inform Plaintiff of possible negative outcomes associated with these problems, and "continually represented to [Plaintiff] that [Defendant] had no responsibility for the WIPP incident." Plaintiff claims that Defendant knew or should have known about the potential issues of its packaging program during the time the Teaming Agreement was in effect; that it did not disclose the extent of its involvement in the WIPP incident after executing the Teaming Agreement; and that it owed a duty to disclose any issues that "might reasonably be expected to result in any material adverse change in the ability of either party to perform the work covered by such proposal or contemplated subcontract. [Defendant] never brought the waste packaging issues that ultimately affected the subcontract to the attention of [Plaintiff]." Plaintiff attributes the termination of its project and LANS' choice to perform more work internally as a punitive measure in response to Defendant's alleged misconduct during the WIPP incident.

Plaintiff also disputes Defendant's assertion that it always complied with Plaintiff's staffing level requests, stating that Defendant used "heavy-handed tactics" and "overruled"

---

[4] Defendant operated as the prime contractor on that project; Plaintiff was not involved in and was not a party to that project.
[5] These disputed facts are drawn from Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 113) and are relevant in that they form the basis of Plaintiff's factual opposition to that motion and Defendant's Motion for Reconsideration.

Plaintiff's managerial staff to manipulate the contract to monopolize work to the exclusion of the other subcontractors.

### RELEVANT PROCEDURAL HISTORY

On November 8, 2019, the Court denied Defendant's Motion for Summary Judgment on its Counterclaims (November Order) for, *inter alia*, breach of contract, or in the alternative, breach of covenant of good faith and fair dealing and unjust enrichment.  Defendant seeks damages in the amount of $1,057,354.63; the total of payments withheld by Plaintiff for the work Defendant performed. *See* Memorandum Opinion and Order (**Doc. 158**). The Court did not reach the merits of the majority of Defendant's claims, denying the motion instead because, although Defendant's argument was "persuasive," it sought payment for work performed after the issuance of Bradshaw's May 12 letter, as opposed to work completed solely beforehand.  Specifically, while the Court acknowledged that Edgmon[6] continued to authorize and assign work to Defendant, it found that a factual dispute existed as to whether Defendant performed work at its own risk following Bradshaw's letter and that "It is also not clear whether the letter's 35% restriction had any effect on the parties' contract and, if so, whether Defendant complied with the 35% restriction after receiving the letter."

On February 11, 2020, the undersigned granted Defendant's motion for summary judgment on Plaintiff's claims for breach of contract and fraud, and on February 14, 2020, granted Defendant's motion for partial summary judgment on Plaintiff's New Mexico Unfair Trade Practices claim, thereby disposing of Plaintiff's remaining claims.

---

[6] Chris Edgmon was Plaintiff's project manager responsible for managing the project on a day-to-day basis by scheduling work, budgeting, and approving invoices submitted by the subcontractors, which in turn were submitted to his superior John Rodell for review and approval.

## MOTION FOR RECONSIDERATION

On February 25, 2020, pursuant to Fed. R. Civ. P. 54 (b), Defendant filed the instant motion for reconsideration arguing that the Court's recent decisions, and "in light of [Plaintiff's] many admissions," support reconsideration of the November Order.  Alternatively, Defendant requests that the Court clarify the November Order in that it provided sufficient basis to grant Defendant's motion to the extent that Defendant was entitled to recompense for work invoiced from February – May 2015, which was completed *prior* to Bradshaw's letter. (emphasis added).

Plaintiff opposes the motion, arguing principally that the motion is untimely because it was submitted after the 28 days permitted under Rule 59; that it does not warrant consideration under Rule 60; and that it does not meet the three-factor test for reconsideration as set forth in *Anderson Living Tr. V. WPX Energy Prod., LLC* (308 F.R.D. 410, 430-35 (D.N.M. 2015)). Plaintiff claims that Defendant's motion is "premised on a theory that [Defendant] did not owe a duty of good faith and fair dealing to disclose that its actions contributed to the WIPP closure so [Plaintiff] could evaluate whether it was prudent to continue its relationship with [Defendant]." Plaintiff also asserts that Plaintiff's own employees and Defendant disregarded Bradshaw's authority, in continuing to assign and complete work respectively, after his letter stating that Defendant would be continuing to work at its own risk if it exceeded a 35% share of the labor going forward.

In reply, Defendant argues that Rule 54 (b) permits the Court to exercise review of a prior order until entry of final judgment adjudicating all claims within an action, thus Fed. R. Civ. P. 59 and 60 are inapplicable to reconsideration of this interlocutory order, that the Court's February 11 and 14 decisions found Plaintiff's current arguments to be without merit; and that even under the three-factor test advanced in *Anderson*, the motion warrants reconsideration in Defendant's favor.

## LEGAL STANDARD

Generally, the Federal Rules of Civil Procedure do not provide a mechanism pursuant to which a party may file a "motion to reconsider." *United States v. Emmons*, 107 F.3d 762, 764 (10th Cir. 1997) (quotation omitted). However, Rule 54 (b) provides:

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, *any order or other decision,* however designated, *that adjudicates fewer than all the claims* or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities. (emphasis added)

In *Anderson Living Tr. v. WPX Energy Prod., LLC* (312 F.R.D. at 647) the Court explained the appropriate standard in the context of a Rule 54 (b) motion:

> The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." *Been v. O.K. Indus.,* 495 F.3d 1217, 1225 (10th Cir.2007). In the Tenth Circuit, "law of the case doctrine has *no* bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another." *Rimbert v. Eli Lilly & Co.,* 647 F.3d 1247, 1252 (10th Cir.2011)(emphasis added)(citing *Been v. O.K. Indus., Inc.,* 495 F.3d at 1225). In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.' " *Been v. O.K. Indus., Inc.,* 495 F.3d at 1225 (quoting *Avitia v. Metro. Club of Chi., Inc.,* 49 F.3d 1219, 1227 (7th Cir.1995)). In short, *a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order. It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review,* it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether. (emphasis added).

*See also Allison v. Bank One-Denver*, 289 F.3d 1223, 1247 (10th Cir. 2002) ("A lower court's ability to depart from its own prior decisions is discretionary.").

## **The Court Exercises De Novo Review of Defendant's Summary Judgment Motion**

The Court has elected to exercise de novo review of Defendant's Motion for Summary Judgment on its Counterclaims (Doc. 98). *See Anderson Living Tr.* at 647. The Court first assesses Defendant's breach of contract claim anew, which it finds meritorious.

### Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 922 F.3d 1033, 1036 (10th Cir. 1993) (citations omitted). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the nonmoving party. *EEOC v. Horizon/CMS Heathcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

**ANALYSIS**

**I.      Preliminary Matters**

**A.  Local Rule 7.1**

In its opposition to Defendant's Motion for Summary Judgment on its Counterclaims, Plaintiff contends that the motion should be denied for Defendant's alleged failure to seek concurrence in accordance with Local Rule 7.1. As it has in its previous Memorandum Opinions and Orders (Docs. 167 and 168) the Court rejects Plaintiff's argument that summary judgment should be denied due to Defendant's alleged procedural violation of Local Rule 7.1 for failure to confer with Plaintiff prior to submission of this motion. *See Bustamante v. Bd. of County Commissioners of San Miguel County*, 2009 WL 10706762, at *2 (D.N.M. Dec. 16, 2009) ("The express language of the rule thus makes clear that while seeking the concurrence of opposing counsel before filing a motion is mandatory, the sanction for violation of the rule rests in the discretion of the Court…").

**B.  Defendant's Motion for Reconsideration is Timely**

In its Response in Opposition to Defendant's Motion for Reconsideration (Doc. 175), Plaintiff attacks Defendant's motion as untimely under Fed. R. Civ. P. 59 as it was submitted more than 28 days after the Court's initial decision. Plaintiff also claims the motion is unqualified pursuant to Fed. R. Civ. P. 60.  Plaintiff has misconstrued the nature of the motion; this is not the appropriate standard pursuant to Fed. R. Civ. P. 54 (b). The matter at hand is not a motion to alter or amend a judgment subject to Rule 59 (e), which mandates 28-day timeline. Nor is this a motion for relief from a final judgment in accordance with Rule 60 (b). Rather, this involves an interlocutory order, which the Court has authority to review and revise at any time prior to entry of a final judgment. FED. R. CIV. P. 54(b); *See also Moses H. Cone Mem. Hosp. v. Mercury Const.*

9

*Corp.*, 460 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."). Defendant's motion is therefore timely.

### C.  Defendant is entitled to Payment for Work Completed Prior to Bradshaw's Letter

As an initial matter, in its opposition briefs to both Defendant's motion for Summary Judgment and the Motion for Reconsideration, Plaintiff does not directly respond to, and thus has not disputed, Defendant's contention that it is entitled, at the very least, to payment for work performed *prior* to Bradshaw's letter. Nor does the Court's November Order conflict with the conclusion that Defendants are entitled to payment for that work.[7] The Court further notes that despite Plaintiff's assertion that Defendant has "failed to provide any evidence that [Plaintiff] was paid for the work [Defendant] specifically performed" (Doc. 113 at 4), Plaintiff has already admitted that it billed LANS and received payment for the invoices subject to this motion.[8]

### II.  __Breach of Contract__

### A.     Parties' Assertions

Defendant claims that Plaintiff breached the terms of the Subcontract Agreement when it failed to pay Defendant for the six invoices submitted for work Defendant completed at Plaintiff's direction and approval. Defendant notes that the terms of the agreement provided that it was entitled to a minimum of 35% of the labor; that Defendant only conducted work it was authorized to do; that Defendant complied with all directives and staffing requests issued by Plaintiff; and that following Bradshaw's letter of cure, Plaintiff nevertheless continued to assign work to Defendant.

---

[7] *See* Doc. 158. The Court took issue with Defendant's claim for payment because it was inclusive of work *after* Bradshaw's letter, as opposed to seeking payment for work performed from February-May 2015, preceding the letter.
[8] *See* Doc. 98 SOF 32 (VP Bradshaw's testimony confirming that Plaintiff billed LANS and received payment for all invoiced work subject to this action.) The Court further notes that by judicial order Plaintiff has also admitted that Defendant "performed the services billed to EDi" in invoice numbers 41537, 40007, 40760, and 42117. *See* Doc. 50 at 11.

In its Opposition to Defendant's Motion for Summary Judgment on its Counterclaims (Doc. 113) Plaintiff argues that Defendant has oversimplified its description of the contract and that the intention of the parties in the formation of it must be considered. Plaintiff focuses on the "events leading up to the subcontract," specifically the execution of the Teaming Agreement, arguing that it was Plaintiff's intent that it be informed of any proceedings that could have a negative impact adversely affecting its rights in continuing to work with Defendant. Plaintiff claims that this "intent" alone demonstrates sufficient ambiguity such that summary judgment should be denied. Plaintiff further posits that there is a genuine question of material fact as to whether Defendant was entitled to payment for any work completed following Bradshaw's letter, which is asserts was a stop work order. Lastly, Plaintiff suggests that Defendant relies too heavily upon statements from Edgmon "to establish the contractual provisions relating to a contract which he neither negotiated or signed and had no authority to approve invoices for payment." Doc. 113 at 4[9].

## B.    Analysis

The Court finds Plaintiff's arguments unavailing and unsupported by the record. As in its prior Memorandum and Opinions (Docs. 167 and 168) the Court disagrees with the assertions set forth in Plaintiff's "Additional Genuine Issues of Material Fact," namely that Defendant violated the Teaming Agreement by performing more than 35% of the work to the exclusion of the other subcontractors; misrepresented its involvement in the WIPP incident, which Plaintiff was not a party to; and failed to mitigate its work on the project following receipt of Bradshaw's letter.

### <u>The Law Regarding Breach of Contract</u>

---

[9] Plaintiff restates this argument in its Opposition to the Motion for Reconsideration, adding that Rodell also exceeded his authority in disregarding Bradshaw's letter.

The parties' contract is governed by the laws of New Mexico (Doc. 99 Ex. G). Pursuant to New Mexico law, the elements of a breach of contract action include: "(1) the existence of a valid and binding contract; (2) the [aggrieved party's] compliance with the contract and his performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of [the other party's] breach." *McCasland v. Prather*, 585 P.2d 336, 338 (Ct. App. 1978).

In *ConocoPhillips Co. v. Lyons* (2013-NMSC-009, ¶ 9, 299 P.3d 844, 849), a contractual dispute relating to interpretation of state gas and oil leases, the Court explained

> Courts will grant summary judgment and 'interpret the meaning as a matter of law' when the 'evidence presented is so plain' that it is only reasonably open to one interpretation. If, however, a court determines that the contract is 'reasonably and fairly' open to multiple constructions, then 'an ambiguity exists,' summary judgment should be denied, and the jury should resolve all 'factual issues presented by the ambiguity' (internal citations omitted).

An ambiguity exists where

> the parties' expressions of mutual assent lack clarity. The question whether an agreement contains an ambiguity is a matter of law to be decided by the trial court. The court may consider collateral evidence of the circumstances surrounding the execution of the agreement in determining whether the language of the agreement is unclear … If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists. At that point, if the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact finder[.] (citations omitted).

*Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235.

Here, there is no dispute as to the validity of the underlying contract. The terms of the Teaming Agreement and the subcontract both expressly provide that the 35% share of labor is *a minimum* guarantee, not a maximum, which Bradshaw and Edgmon confirmed in their depositions. (Doc. 99 Ex G; Ex. A 69:3-25, 104:3-12; Ex. C 77:16-25, 78:1). Plaintiff repeatedly confirmed that Defendant only completed work assigned to it, including after Bradshaw's letter, and that it

did so in an acceptable fashion. *See* Doc. 99 Ex. B 64:5-11; Ex. C 171:22-25, 172:1-8. Plaintiff's arguments are particularly unconvincing given that it undisputedly subsequently billed and collected payment for the very same work from LANS, but then did not pay Defendant, in violation of the subcontract's provision that "[p]ayments shall be issued to Subcontractor after receipt and approval of Subcontractor's invoices by EDi and within 10 days of receipt of payment from the [LANS]." (*See* Doc. 99 Ex. C 90:19-25 – 91:1-9 (Edgmon confirming these terms in the subcontract and acknowledging EDi's failure to adhere to it). Accordingly, the Court finds that Defendant has demonstrated the requisite elements of a breach of contract.

Additionally, Plaintiff has not convincingly substantiated its arguments of intent and ambiguity with citation to the record. As previously expressed by this Court (Doc. 167), a plain reading of the Teaming Agreement reveals that it was unambiguously prescribed to expire upon execution of the subcontract. Pertinent terms of the Teaming Agreement, capable of only one interpretation (*see ConocoPhillips Co. v. Lyons*, P.3d 844 at 852) are incorporated into the Subcontract, which unequivocally includes that Defendant was entitled to a *minimum* of 35% of the share of labor.

**Plaintiff's Additional Material Facts are without Support in the Record**[10]

Plaintiff relies upon a series of allegations in opposing Defendant's Motion for Summary Judgment and its Motion for Reconsideration. The Court finds these facts to be conclusory and absent support in the record.

**The WIPP Incident**

Plaintiff claims that Defendant's motions rest upon the premise that it did not violate a duty of good faith and fair dealing in allegedly failing to disclose its involvement in the WIPP incident.

---

[10] The sum of these facts are provided in the Background section entitled "Plaintiff's Additional Facts"

This argument fails to respond to Defendant's counterclaims which are grounded in the undisputed assertion that Defendant performed assigned work which it then invoiced Plaintiff for, after which Plaintiff billed and collected payment for from LANS but did not in turn submit payment to Defendant. Having previously reviewed the facts and evidence surrounding the WIPP incident, the ensuing DOE Accident Investigation Board Report[11], and the unrefuted testimony of Plaintiff's employees charged with management of the project, this Court found Plaintiff's arguments in this vein to be without merit. *See* Doc. 168 at 7 ("Plaintiff's reliance upon the results of AIB report is misplaced; there is nothing within that indicates Defendant engaged in discussions regarding improper packaging as early as September 2011, or that it knew or should have known of packaging issues.") Among other things, the Court found that Defendant cooperated with Plaintiff and kept Plaintiff apprised of ongoing developments in the investigation,[12] and even offered to withdraw from the contract to prevent potential harm to Plaintiff. [13]

### The Authority of Plaintiff's Employees

In its opposing briefs to Defendant's Motions for Summary Judgment and for Reconsideration, Plaintiff advances the theory that its own employees, Rodell and Edgmon, in continuing to authorize work to Defendant following Bradshaw's letter, exceeded their authority,

---

[11] Defendant disputes Plaintiff's use of the Report as inadmissible hearsay. Without reaching the merits of this argument, the Court nevertheless finds Plaintiff's allegations unsupported by the content of the Report.

[12] This disposes of Plaintiff's confusing "intent" argument to be informed of potential adverse events because the record supports that Defendant was cooperative and did inform Plaintiff of ongoing developments in the investigation.

[13] *See* Doc. 167 P.8. "The record reflects… Defendant did not attempt to obscure its involvement after the WIPP incident, but was in fact cooperative. (Doc. 99 Ex. B 102: 15-22; Ex. C 187: 13-25; Ex. D 202: 1-19). Nor is the Court convinced by Plaintiff's conclusory statement that the WIPP incident was attributable to the cancellation of Plaintiff's contract with LANL, considering Plaintiff's employees' contradictory testimony. (Doc. 99 Ex. C 146: 16-25, 147: 10-14; Ex. D 197: 8-25-198:1)"; Doc. 168 P.8. "Defendant did not attempt to obscure its involvement after the WIPP incident but was in fact cooperative. (SOF 27-28).  Edgmon confirmed that the parties maintained open dialogue regarding the ongoing investigation. (Doc 99. Ex. C 193:6-18). Moreover, Edgmon and Rodell both testified that Defendant offered to withdraw as subcontractor following the WIPP incident to avoid potential complications for Plaintiff (SOF 29-30).  Plaintiff's conclusory denials in its Opposition do not point to contradictory facts.  Plaintiff's opposition, arguing that Defendant may have offered to withdraw to Rodell but not to anyone with authority at EDi is disingenuous since Rodell was designated by Bradshaw as the authority on all day-to-day aspects of the project. (Doc. 99 Ex. A 22:4-12)."

14

and claims that Defendant should have mitigated its loss or sought further clarification in response to the letter rather than continue to perform the assigned work. The Court disagrees. To claim that Edgmon and Rodell exceeded their authority, as the employees specifically tasked with everyday management and control of the project, a fact which Bradshaw confirmed, is both conclusory and unsupported by the record.[14] Furthermore, the proposition that Defendant should have limited its work or sought further clarification after receipt of Bradshaw's letter, when it was expressly authorized and assigned by Plaintiff, is illogical and contradicted by unrefuted testimony of Plaintiff's own employees.[15] *See* Doc. 167 at 8. Notably, Plaintiff's argument that its employees lacked authority to handle contractual matters is further belied by Bradshaw's testimony that he did not participate in discussions surrounding the instant subcontract and that he believed Rodell was the company representative who engaged in subcontractor negotiations for the project. *See* Doc. 99 Ex. A 95:7-25 – 96:1-14.

### III.   Defendant's Unjust Enrichment Claim

Even assuming, *arguendo*, that Defendant failed to establish a claim for breach of contract, Defendant has adequately pled its alternative claim for unjust enrichment.

#### A.  Parties' Assertions

In the alternative to its breach of contract claim, Defendant argues that allowing Plaintiff to retain the benefit of payment from LANS for Defendant's labor, without compensating Defendant, would be manifestly unjust. Plaintiff contends that Bradshaw's letter was effectively a stop work order, which raises a genuine issue of material fact as to whether Defendant is entitled

---

[14] As discussed in this Court's MOO's Docs. 167 and 168, it is unclear what Rodell's exact title was, but the record reflects that Edgmon deferred to him and he made final decisions regarding the project on a day-to-day basis. *See also* Doc. 99 Ex. A 21:1-10 (Bradshaw admitting he did not object to Rodell using the title of COO and that "he acted a lot in that role from a function perspective"), and 22:4-21 (Rodell was responsible for everything related to the MTOA2 project).

to any money. Plaintiff alleges that because the underlying contract was terminated due to Defendant's mismanagement of waste packaging in its prior work with LANS, rather than being unjustly enriched, Plaintiff has actually been harmed.

### B. Analysis

#### The Law Regarding Unjust Enrichment

In New Mexico, a party may prevail on an unjust enrichment claim by showing that "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co., Inc. v. Sanchez*, 129 N.M. 200, 203 (Ct. App. 2000) (citing RESTATEMENT (FIRST) OF RESTITUTION §§ 1, 40, 41 (1988)).

It is undisputed that Defendant only carried out work authorized by Plaintiff; that Defendant submitted six invoices dating from March 10 - August 11, 2015 amounting to $1,057,354.63, for which it was not paid; and that Plaintiff submitted invoices to LANS for the same work and received payment. Bradshaw expressly testified that Defendant completed the work and that he intended to pay Defendant. Doc. 99 Ex. B 124:3-14. Noting that Plaintiff has not cited any authority in support of its viewpoint; has not addressed the merits of Defendant's claims with respect to work completed prior to Bradshaw's letter; and having already disposed of its factual allegations as being without merit, the Court concludes that Defendant has demonstrated entitlement to payment under its alternative claim of unjust enrichment.[16]

### IV.    The *Anderson* Three-Factor Test

In its opposition to Defendant's Motion for Reconsideration, Plaintiff suggests that the Court should utilize the three-factor test provided in *Anderson*, which it claims militates against

---

[16] The Court will not discuss the merits of Defendant's remaining arguments relating to promissory estoppel and open account, having already concluded that it is entitled to payment under a claim for breach of contract and, alternatively, under a theory of unjust enrichment.

reconsideration. In reply, noting that the *Anderson* test is not compulsory, Defendant contends that the factors nevertheless weigh in its favor. While the Court agrees that it is not bound to apply the test, it finds it helpful in assessing the instant motion.

### The First Factor

First, *Anderson* provides that "the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges." *Anderson Living Tr.* at 647.  Plaintiff claims that Defendant is merely rehashing the arguments it set forth in its initial motion for summary judgment, effectively "asking the Court to grant a mulligan on its earlier failure to present persuasive argument and evidence." In support, Plaintiff points to November Order determination that a factual dispute may exist in light of Bradshaw's letter, which Plaintiff states was "ignored by ESGG without any explanation or reason." Plaintiff restates that its employees exceeded their authority in continuing to assign work to Defendant after the letter and that Defendant failed to address the issue of whether work was done at its own risk.

For the reasons previously stated, this Court, having extensively reviewed the record and evaluated the parties' arguments, disagrees with Plaintiff's assertions, which it found unsupported by the record and contrary to the many admissions of Plaintiff's authorized employees tasked with executing the project, authorization which Bradshaw confirmed[17]. The Court also notes that Defendant did discuss the issue of the purported stop work order in the Reply brief of its Motion for Summary Judgment on its Counterclaims. *See* Doc. 117 pp. 10-11.

### The Second Factor

---

[17] *See* Doc. 99 Ex. A 22:4-12; 110:2-25 (Bradshaw confirming Edgmon and Rodell's authority and stating that the project was "totally his [Rodell's] responsibility.")

Under the second factor, "the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling. *Anderson Living Tr.* at 648.

The basis of Plaintiff's contentions are that there is an outstanding objection to the Court's December 4, 2019 Order denying Plaintiff's Motion to Compel, which if granted would purportedly force Defendant to produce information which may overturn the Court's most recent decisions, and that there is a pending motion to appoint a third party mediator to "allow the parties to amicably resolve this dispute."[18]

Preliminarily, Plaintiff's first argument is moot, this Court having overruled the objection. *See* Doc. 187. The Court is also unconvinced that the pending motion for appointment of a third-party mediator, filed months after the November Order and after substantive determinations rendered on the merits of the case, is grounds for the Court to deny reconsideration.

**The Third Factor**.

*Anderson*'s third factor advises that the Court "should consider the *Servants of the Paraclete v. Does* grounds. The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new controlling authority—especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence—especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication—one that manifests itself without the need for in-depth analysis or review of the facts— that the Court erred." *Id*.

---

[18] The Court elects not to discuss Plaintiff's other arguments under this factor, namely that the motion is untimely pursuant to Rule 59 or that Defendant failed to appropriately respond to reasoning of the November Order, having already rejected them.

Significantly, the *Anderson* Court qualified the three-factor test:

> These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review… Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result— although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

Plaintiff, citing *Servants of the Paraclete*, argues that "Absent extraordinary circumstances, not present here, the basis for the second motion must not have been available at the time the first motion was filed." Plaintiff again restates that Defendant failed to address why its initial motion for summary judgment was denied; that Defendant rehashes its prior arguments, which Plaintiff claims actually support the conclusion that its employees exceeded their authority, and that Defendant therefore had a duty to mitigate its damages and seek clarification following Bradshaw's letter.

In *Rimbert v. Eli Lilly & Co.* (647 F.3d 1247, 1252 (10th Cir. 2011)), the Court differentiated reconsideration of final judgments and "interim" orders in the context of *Servants*, noting that "In *Servants of Paraclete v. Does,* this court merely announced the principles under which a motion for reconsideration after a final judgment should be granted, *a wholly separate inquiry from the standard under which we review reconsideration of an interim order*." (citation omitted) (emphasis added).

Here, the Court is exercising review of an interlocutory order, not a final judgment. As previously explained, the Court has found the arguments Plaintiff relies upon to be speculative and unsupported by the record. Accordingly, even when applying the *Anderson* factors, the Court holds that, on balance, Defendant's motion for reconsideration should be granted.

CONCLUSION

For the reasons herein stated, summary judgment is entered in favor of Defendant on liability as to Defendant's breach of contract counterclaim.

**IT IS HEREBY ORDERED** that Defendant's Opposed Motion for Reconsideration **(Doc. 169)** is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment as to Defendant's counterclaims **(Doc. 98)** is **GRANTED**.

KEA W. RIGGS
UNITED STATES DISTRICT JUDGE