IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ENVIRONMENTAL DIMENSIONS, INC.,

    Plaintiff,

v.                                                                                                              No. 1:16-cv-1056-KWR-JHR

ENERGYSOLUTIONS GOVERNMENT
GROUP, INC. (n/k/a Atkins Energy
Government Group, Inc.),

    Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION FOR RECONSIDERATION

THIS MATTER comes before the Court upon Plaintiff's Motion for Reconsideration, filed March 11, 2020 **(Doc. 172)**. The Court has reviewed the motion and finds that it is not well-taken and, therefore, is denied.

### BACKGROUND[1]

This dispute arises from a nuclear waste remediation project the parties worked on together at Los Alamos National Lab ("LANL"). Plaintiff is in the business of providing environmental resources and radioactive waste management and containment support to the U.S. Department of Energy and other government agencies. The company is managed predominately by its Vice President, Michael Bradshaw ("Bradshaw"). Plaintiff engaged in a bidding process for qualification to contract with Los Alamos National Security, LLC ("LANS") to perform transuranic waste remediation work at LANL. Defendant provides nuclear waste remediation and

---

[1] The parties have not provided a factual background in the instant briefs. Therefore, the Court adopts facts taken from its Decision granting Defendant's Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract and Fraud (Doc. 167); the motion Plaintiff claims merits reconsideration.

personnel support and worked with LANL previously on other projects. Prior to submitting its bid, Plaintiff executed a Teaming Agreement with Defendant on July 12, 2011, specifying the duties and responsibilities of the parties should the bid be accepted. The Agreement includes that, "[i]n any event, EnergySolutions' share will be a minimum of 35% of the total contract labor value earned in performance of the life cycle of the anticipated contract issued by LANS." The Agreement contains an additional provision that "[e]xcept as expressly provided … all rights and obligations of the parties under this Agreement shall terminate on the earliest of the following: … e. Execution by both parties of the subcontract contemplated by this Agreement." Doc. 99 Ex. G.

When Plaintiff was subsequently awarded the contract, denominated as Master Task Order Agreement 2 ("MTOA2"), it subcontracted with Defendant and two other companies to carry out the work. Plaintiff executed the subcontract with Defendant in August 2013, which incorporated the language of the Teaming Agreement guaranteeing Defendant a 35% minimum share of the labor. Work began on the project in July 2014.

Plaintiff's employees, project manager Chris Edgmon ("Edgmon") and COO/VP of business development John Rodell ("Rodell")[2] were tasked with coordinating the work on a day-to-day basis. Edgmon was responsible for, among other things, scheduling work, budgeting, and approving invoices submitted by the subcontractors, which in turn were submitted to Rodell for review and approval. Bradshaw had little involvement in the day-to-day operations of the project, and most decisions were largely left to Edgmon and Rodell.

Defendant took on a larger role than the other subcontractors in performance of the work, consequently billing for a larger share than the minimum 35% expressed in the Teaming Agreement and the subcontract. It is undisputed that Defendant only carried out work authorized

---

[2] It is unclear what Rodell's exact title is, but the record reflects that Edgmon deferred to him and he made final decisions regarding the project on a day-to-day basis.

by Plaintiff; that Defendant submitted six invoices dating from March 10 - August 11, 2015 amounting to $1,057,354.63, for which it was not paid; and that Plaintiff submitted invoices to LANS for the same work and received payment.  On May 12, 2015, Bradshaw sent a letter of cure to Defendant stating it was not in compliance with the terms of the Teaming Agreement and that "[i]n spite of repeated attempts by EDi to realign the staffing to meet the TA [Teaming Agreement] goals, Energy*Solutions* continued refusal has forced us to take action… [i]f this matter is not resolved by Friday May 15, 2015, any work [going forward] performed by Energy*Solutions* above and beyond 35% is done so solely at Energy*Solutions'* risk." (Doc. 112 Ex. 2).  After Bradshaw's letter, Plaintiff continued to assign work to Defendant, which it performed until the underlying Task Order was terminated by LANS on May 27, 2015.

## PROCEDURAL HISTORY

On February 11, 2020, the Court entered a Memorandum Opinion and Order (February 11 Order) granting Defendant's Motion for Summary Judgment on Plaintiff's Breach of Contract and Fraud claims.[3] Doc. 167. Pursuant to Fed. R. Civ. P. 60, Plaintiff seeks reconsideration of the Court's decision claiming (1) that the Order is inconsistent with prior rulings; and (2) that it is unfair and unjust.

## DISCUSSION

In accordance with Fed. R. Civ. P. 60 (b), the Court has the authority to grant relief "from a final judgment, order, or proceeding" based on mistake, inadvertence, surprise, or excusable neglect; newly discovered evidence; fraud; a void or ineffective judgment; or for any other reason that justifies relief.

**I.    Rule 60 is Inapplicable**

---

[3] On February 14, 2020, the Court granted Defendant's Motion for Partial Summary Judgment on Plaintiff's New Mexico Unfair Trade Practices claim, thereby disposing of Plaintiff's remaining claims.

Plaintiff incorrectly petitions the Court for reconsideration in accordance with Fed. R. Civ. P. 60, which permits the Court to grant relief of a *final* judgment or order (emphasis added). As such the instant motion could be denied procedurally. However, even assuming the motion was appropriately brought before the Court, Plaintiff has failed to articulate substantive grounds for reconsideration.

### II. Plaintiff's Arguments are Without Merit

Plaintiff contends that the February 11 Order is inconsistent with prior rulings. Plaintiff argues that while the Court relied upon the terms of the Teaming Agreement to conclude that Defendant was entitled to a minimum of 35% of the contract labor, it neglected to consider Defendant's failure to comply with article XIII(a) of the same agreement. In the pertinent part, Article XIII(a) states:

> There shall be no limitation or proceeding pending or threatened against either party or any of its offers or employees (i) which is or the purpose of enjoining or other-wise restricting the activities contemplated by this agreement, or otherwise claiming that any such activity is improper; (ii) which would adversely affect the rights and/or capabilities of either party in respect of such activities….

Doc. 99 Ex. G

Plaintiff claims that Defendant was aware of issues with its waste packaging procedures as early as September 2011, relating to a prior project Defendant engaged in separately with LANL, in which an improperly packaged waste drum burst ("WIPP Incident"). Plaintiff asserts that the WIPP Incident led to the closure of the WIPP facility and the punitive termination of Plaintiff's project. It claims that despite having prior knowledge of the potential adverse impact on its project with Plaintiff, Defendant failed to notify Plaintiff in accordance with the Teaming Agreement and in violation of its duty of good faith and fair dealing. Plaintiff avers that Defendant's conduct was "[o]verreaching, malicious, or wanton conduct" and was "inconsistent with legitimate business

interests, violates community standards of decency, and tends to undermine the stability of expectations essential to contractual relationships. When this is the case, it is appropriate to allow the jury to determine whether the public interest will be served by the deterrent effect punitive damages will have upon future conduct." Doc. 172 at 3 (citation omitted). Defendant supports these assertions by claiming it was informed by LANL counsel that it was terminating the project and self-performing the remainder of work "because of Defendant's incompetence in waste packaging as discussed with Defendant in September 2011. *See,* March 2, 2016 letter from Los Alamos National Laboratory Office of Laboratory Counsel, Doc 111, Exhibit 1."

### A. The Court's Ruling is not Inconsistent

Plaintiff suggests the February 11 Order is inconsistent with a prior discovery order, filed March 28, 2019, denying Defendant's Motion to Quash, in which the Court found that "the work and claims relating to the [WIPP incident] settlement agreement overlap in both nature and scope of the work and claims in this case" and a "reasonable fact finder may determine that the WIPP incident was a cause of [Plaintiff's] alleged damages in this case." Doc. 123 at 7.

The Court finds Plaintiff's argument unconvincing. Generally, "[t]he federal discovery rules reflect the courts' and Congress' recognition that 'mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.' As a result of this policy, rule 26 'contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case.'" *United States v. 2121 Celeste Rd. SW, Albuquerque, N.M.*, 307 F.R.D. 572, 582 (D.N.M. 2015) (internal citations omitted).

In denying the motion to quash, the Court noted that "two of [Plaintiff's] claims are premised almost entirely on the WIPP incident and the effect that incident had on the contract between LANS and [Plaintiff]." The discovery order was not a dispositive motion and did not

address the substance of the parties' claims, but rather held that the information sought was not necessarily irrelevant and, on that basis, denied the motion. In its February 11 Order, the Court considered the facts and evidence offered by the parties, and concluded that Plaintiff could not prevail on the merits even in the light most favorable to it, because Plaintiff failed to establish grounds for breach of contract (and fraud), and its allegations were unsupported by the record. In doing so, the Court issued a dispositive decision. The fact that the determination was not in Plaintiff's favor does not render it inconsistent with a prior, liberally construed discovery order.

### B. Defendant did not Violate its Duty of Good Faith and Fair Dealing

Plaintiff next argues that Defendant's violated Clause XIII(a) of the Teaming Agreement in failing to disclose its knowledge of potential packaging issues leading to the WIPP Incident, which Defendant was allegedly aware of in September 2011, two months after executing the Teaming Agreement. As an initial matter, the Court found that the terms of the Teaming Agreement expressly expired upon execution of the subcontract. Doc. 167 at p. 7-8. Thus, Article XIII(a) was no longer in effect at the time of the WIPP Incident. The Court also found Plaintiff's arguments unavailing given the timing of the WIPP Incident, which occurred on February 14, 2014, three years after the Teaming Agreement and six months after execution of the subcontract. *See* Doc. 167 at 8. Furthermore, the Court held that "the record reflects, from the testimony of Plaintiff's employees directly involved with the MTOA2 project, that no misrepresentations were made by Defendant at the time of entering into the Teaming Agreement or the subcontract, and that Defendant did not attempt to obscure its involvement after the WIPP incident, but was in fact cooperative. (Doc. 99 Ex. B 102: 15-22; Ex. C 187: 13-25; Ex. D 202: 1-19)." Plaintiff has not cited anywhere in the record to refute these conclusions, merely repeating unsupported allegations previously advanced. Its assertion that Defendant acted maliciously and wantonly is equally

without reference to the record. Plaintiff has therefore failed to articulate a violation of the duty of good faith and fair dealing.

### C. Plaintiff's Assertions are Speculative and Absent Support in the Record

Plaintiff points generally to the DOE Accident Investigation Board Report in support of its allegation that Defendant was aware of issues with its packaging procedures as early as September 2011. The Court is somewhat nonplussed by Plaintiff's repeated insistence on this fact, having already determined this argument to be without merit. *See* Doc. 168 at 7 ("Plaintiff's reliance upon the results of AIB report is misplaced; there is nothing within that indicates Defendant engaged in discussions regarding improper packaging as early as September 2011, or that it knew or should have known of packaging issues.").

In the instant motion, Plaintiff, not for the first time, directs the Court to portions of the record that do not support its statements in any manner. Here, Plaintiff refers to Doc. 111 Ex. 1, which it states contains a March 2, 2016 letter from LANL's counsel specifying that Plaintiff's project was being terminated due to Defendant's incompetence with respect to its packaging procedures "as discussed with Defendant in September 2011." Doc. 185 at 4.  However, Exhibit 1 contains the April 2015 Accident Investigation Board Report. There is no letter in the Exhibit with Plaintiff's purported content or, for that matter, in any of the Doc. 111 Exhibits.

Upon its own initiative, the Court has scoured the record and located a letter from LANL counsel to Defendant (Doc. 99 Ex. Z), dated March 3, 2016. Even assuming that is the letter to which Plaintiff refers, the letter effectively rebuts the substance of Plaintiff's unsupported accusations. In the pertinent parts, the letter states that in 2012 when Plaintiff contracted with LANS, "None of us contemplated at that time the discovery of the drum, the temporary suspension of the WIPP site, or the serious compliance issues that caused the drum breach." The letter

reiterates LANS' right, pursuant to the parties' agreement, to maintain flexibility in its assignment of work.[4] While the letter acknowledges that "subcontract management issues were contributing factors to the WIPP event" which influenced its decision to self-perform more work through its internal employees, there is nothing along the lines of Plaintiff's allegation as to Defendant's knowledge of issues in September 2011. Moreover, the letter categorically denies that LANS sought "retribution" against Plaintiff, and even suggests that LANS may yet assign work to Plaintiff as "more than a technical possibility…" Accordingly, the Court concludes Plaintiff's motion is wholly unsupported by the record and, therefore, is denied.

### III.    No Need for Oral Argument

In its Motion for Reconsideration, Plaintiff requested oral argument pursuant to Local Rule 7.6 (a). ("A motion will be decided on the briefs unless the Court sets oral argument.")   In this motion, Plaintiff claims that the Court erred by making an inconsistent decision and suggest oral argument would permit the Court to ask questions for clarification.  Because the Court finds Plaintiff's arguments to be without merit, it declines Plaintiff's request as unnecessary.

### CONCLUSION

**THEREFORE, IT IS ORDERED** that Plaintiff's Motion for Reconsideration **(Doc. 172)** is hereby **DENIED** for reasons described in this Memorandum Opinion and Order.



KEA W. RIGGS
UNITED STATES DISTRICT JUDGE

---

[4] *See* Doc. 99 Ex. Z ("Surely, however, all of us at the time of execution of the contract were familiar with the flexibility and discretion provided LANS under the terms and conditions of a task order agreement. The MTOA gives LANS the discretion to choose to use your services or not for any reason, and we strongly believe that the associated intervening events associated with WIPP give us every justification to develop new approaches to manage the TRU waste program even if EDi does not receive tasks under the MTOA as a result.").