IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ENVIRONMENTAL DIMENSIONS, INC.,

    Plaintiff,

v.                                                                              No. 1:16-cv-1056-KWR-JHR

ENERGYSOLUTIONS GOVERNMENT
GROUP, INC. (n/k/a Atkins Energy
Government Group, Inc.),

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court upon its Order ruling on Defendant's remaining counterclaims. **Doc. 196.** The Court previously granted summary judgment in favor of Defendant on all of Plaintiff's claims. **Doc. 167.** Defendant also prevailed on certain counterclaims against Plaintiff, which appear to resolve all issues surrounding liability. **Doc. 188.** Pursuant to the Court's preceding Order (**Doc. 190)**, the parties were required to submit respective status reports. The Court accepted Defendant's request to rule upon the remaining counterclaims within its Motion for Summary Judgment on Defendant's Counterclaims (**Doc. 98)**, which was opposed by Plaintiff. **Doc. 113**. Plaintiff's status report was effectively non-responsive to the Court's directive.

### BACKGROUND[1]

The claims arise from a dispute involving a nuclear waste remediation project the parties worked on together at Los Alamos National Lab ("LANL"). Plaintiff is in the business of providing environmental resources and radioactive waste management and containment support

---

[1] The Court incorporates the following factual background from findings in its preceding MOO's. *See* Docs. 167, 168 and 188.

to the U.S. Department of Energy and other government agencies. The company is managed predominately by its Vice President, Michael Bradshaw ("Bradshaw"). Plaintiff engaged in a bidding process for qualification to contract with Los Alamos National Security, LLC ("LANS") to perform transuranic waste remediation work at LANL. Defendant provides nuclear waste remediation and personnel support and worked with LANL previously on other projects. Prior to submitting its bid, Plaintiff executed a Teaming Agreement with Defendant on July 12, 2011, specifying the duties and responsibilities of the parties should the bid be accepted. The Agreement includes that, "[i]n any event, EnergySolutions' share will be a minimum of 35% of the total contract labor value earned in performance of the life cycle of the anticipated contract issued by LANS." The Agreement contains an additional provision that "[e]xcept as expressly provided … all rights and obligations of the parties under this Agreement shall terminate on the earliest of the following: … e. Execution by both parties of the subcontract contemplated by this Agreement." (Doc. 99 Ex. G).

When Plaintiff was subsequently awarded the contract, denominated as Master Task Order Agreement 2 ("MTOA2"), it subcontracted with Defendant and two other companies to carry out the work. Plaintiff executed the subcontract with Defendant in August 2013, which incorporated the language of the Teaming Agreement guaranteeing Defendant a 35% minimum share of the labor. The subcontract further provided that "[p]ayments shall be issued to Subcontractor after receipt and approval of Subcontractor's invoices by EDi and within 10 days of receipt of payment from the [LANS]."

Through a series of modifications, Defendant was authorized to bill up to $3,500,000 for completed work. At no time did Defendant exceed this amount. Work began on the project in July 2014.

Plaintiff's employees, project manager Chris Edgmon ("Edgmon") and COO/VP of business development John Rodell ("Rodell")[2] were tasked with coordinating the work on a day-to-day basis. Edgmon was responsible for, among other things, scheduling work, budgeting, and approving invoices submitted by the subcontractors, which in turn were submitted to Rodell for review and approval. Bradshaw had little involvement in the day-to-day operations of the project, and most decisions were largely left to Edgmon and Rodell.

Defendant took on a larger role than the other subcontractors in performance of the work, consequently billing for a larger share than the minimum 35% expressed in the Teaming Agreement and the subcontract. It is undisputed that Defendant only carried out work authorized by Plaintiff; that Defendant submitted six invoices dating from March 10 - August 11, 2015 amounting to $1,057,354.63, for which it was not paid; and that Plaintiff submitted invoices to LANS for the same work and received payment. On May 12, 2015, Bradshaw sent a letter of cure to Defendant stating it was not in compliance with the terms of the Teaming Agreement and that "[i]n spite of repeated attempts by EDi to realign the staffing to meet the TA [Teaming Agreement] goals, Energy*Solutions* continued refusal has forced us to take action… [i]f this matter is not resolved by Friday May 15, 2015, any work [going forward] performed by Energy*Solutions* above and beyond 35% is done so solely at Energy*Solutions'* risk." (Doc. 113 Ex. 2). After Bradshaw's letter, Plaintiff continued to assign work to Defendant, which it performed until the underlying Task Order was terminated by LANS on May 27, 2015.

Plaintiff originally sued Defendant raising, among other claims, breach of contract and violation of New Mexico's Unfair Trade Practices Act. Plaintiff largely attributed LANS' choice to terminate the project and perform more work internally as a punitive measure in response to

---

[2] It is unclear what Rodell's exact title is, but the record reflects that Edgmon deferred to him and he made final decisions regarding the project on a day-to-day basis.

3

Defendant's alleged misconduct during the February 14, 2014 "WIPP incident," when an improperly packaged waste drum packaged by Defendant at LANL, while working on another project[3], underwent an exothermic reaction and burst, causing a radiological release.

## RELEVANT PROCEDURAL HISTORY

On November 8, 2019, the Court denied Defendant's Motion for Summary Judgment on its Counterclaims (November Order) for, *inter alia*, breach of contract, or in the alternative, breach of covenant of good faith and fair dealing and unjust enrichment. Defendant seeks damages in the amount of $1,057,354.63; the total of payments withheld by Plaintiff for the work Defendant performed. *See* Memorandum Opinion and Order (**Doc. 158**). The Court did not reach the merits of the majority of Defendant's claims, denying the motion instead because, although Defendant's argument was "persuasive," it sought payment for work performed after the issuance of Bradshaw's May 12 letter, as opposed to work completed solely beforehand. This case was subsequently transferred to the undersigned. On February 11, 2020, the undersigned granted Defendant's motion for summary judgment on Plaintiff's claims for breach of contract and fraud, and on February 14, 2020, granted Defendant's motion for partial summary judgment on Plaintiff's New Mexico Unfair Trade Practices claim, thereby disposing of Plaintiff's remaining claims. On April 30, 2020, the Court granted Defendant's Motion for Reconsideration (**Doc. 188**), thereby granting summary judgment on Defendant's counterclaim for breach of contract and alternatively for unjust enrichment. The Court did not reach the merits of Defendant's other counterclaims. On July 6, 2020, in accordance with Defendant's status report request, the Court addressed the remaining counterclaims, ruling in Defendant's favor but deferring with respect to its counterclaim for an open account/account stated. **Doc. 196.** Pursuant to Fed. R. Civ. P. 56 (f) (1), the Court

---

[3] Defendant operated as the prime contractor on that project; Plaintiff was not involved in and was not a party to that project.

provided Defendant's notice that it may grant summary judgment in favor of Plaintiff on this counterclaim and provided the Defendant an opportunity to respond. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 922 F.3d 1033, 1036 (10th Cir. 1993) (citations omitted). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the nonmoving party. *EEOC v. Horizon/CMS Heathcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court addresses Defendant's remaining counterclaims in turn.

ANALYSIS

I.      **Open Account/Account Claim Stated**

The Court directed additional briefing on the matter of an open account/account claim stated. Defendant previously posited that it must prevail on its claim for an open account/account claim stated "because [Plaintiff] ceased paying [Defendant's] invoices for authorized work performed after seven consecutive months of payment." **Doc. 98 at 18**. Plaintiff contended that the alleged stop work order presents an issue of material fact as to whether Defendant was entitled to payment and that an open account claim was inapplicable to the parties' contract because each invoice was "a separate and distinct charge for work and not a rotating account…" **Doc. 113 at 12-13**. The parties have now provided briefing sufficient for the Court to conclude that Defendant has set forth a valid counterclaim.

**The Law Regarding an Open Account**

In *Gentry v. Gentry* (1955-NMSC-055, ¶ 8, 59 N.M. 395, 398) the Supreme Court of New Mexico defined an open account as:

> … an account usually and properly kept in writing, wherein are set down by express or implied agreement of the parties concerned a connected series of debit and credit entries of reciprocal charges and allowances, and where the parties intend that the individual items of the account shall not be considered independently, but as a continuation of a related series, and that the account shall be kept open and subject to a shifting balance as additional related entries of debits or credits are made thereto, until it shall suit the convenience of either party to settle and close the account, and where, pursuant to the original, express, or implied intention, there is to be but one single and indivisible liability arising from such series of related and reciprocal debits and credits, which liability is to be fixed on the one party or the other, as the balance shall indicate at the time of settlement or following the last pertinent entry of the account.

An open account "means, ordinarily, an account based upon running or concurrent dealings between the parties which has not been closed, settled, or stated, and in which the inclusion of

further dealings between the parties is contemplated," (*Heron v. Gaylor*, 1942-NMSC-023, ¶ 6, 46 N.M. 230).

There is a relative dearth of caselaw in New Mexico with respect to what constitutes an open account. In rendering its determination, the Court finds it instructive to look at what New Mexico has stated *is not* an open account. In *Tabet Lumber Co. v. Chalamidas* (1971-NMCA-140, ¶ 3, 83 N.M. 172, 173–74, 489 P.2d 885, 886–87), relating to a contract to repair a building roof, the New Mexico Court of Appeals found that Defendant had not adequately stated a claim for an open account:

> 'Open account' is defined in Gentry v. Gentry, 59 N.M. 395, 285 P.2d 503 (1955) and Heron v. Gaylor, 46 N.M. 230, 126 P.2d 295 (1942); see Panhandle Irrigation, Inc. v. Bates, 78 N.M. 706, 437 P.2d 705 (1968). There is no evidence of a 'connected series of debit and credit entries' or a 'continuation of a related series.' Heron v. Gaylor, supra. Compare Cutter Flying Serv., Inc. v. Straughan Chevrolet, Inc., 80 N.M. 646, 459 P.2d 350 (1969). Nor is there evidence that the amount claimed to be due by plaintiff, and defendant's payments thereon, were intended by the parties as the beginning of a connected or related series. The evidence shows a single independent transaction; an agreement for plaintiff to make roofing repairs to defendant's building, and two payments from defendant on the resulting bill. See Goodsole v. Jeffery, 202 Mich. 201, 168 N.W. 461 (1918).

*See also Selrahc v. Burruss*, 233 Fed. Appx. 819, 825 (10th Cir. 2007) (contract for construction of a motel finding no open account,"[w]hile the parties to this cost-plus contract were unsure exactly how much finally would be spent, all of the terms were set because the contract would end when the building was completed."); *Keeth Gas Co., Inc. v. Jackson Creek Cattle Co.*, 1977-NMSC-087, ¶ 18, 91 N.M. 87, 91, 570 P.2d 918, 922 (an oral contract for a gas pipeline, holding "In the instant case, there were no debit and credit allowances. A set price was to be paid on the number of gallons of gas passing through the pipeline. This is clearly an action on a contract not on an open account.").

Here, the parties contracted for work whereby Defendant submitted weekly invoices on tasked work. Unlike *Tabet* or *Selrahc*, there was no clear termination to the contract in the sense

that the scope of the work encompassed a single task, such as the repair of a roof or construction of a motel. *See* **Doc. 196 at 7-8** ("Throughout the course of their cooperation, Plaintiff continued to assign and authorize Defendant's work. Prior to withholding payment for the invoices subject to this action, Plaintiff consistently remitted payment to Defendant for work performed under the Task Order. The Court concludes that, *in light of this pattern of assignment, authorization and payment*, it was reasonable for Defendant to presume it would be paid for its continued work…") (emphasis added). Plaintiff continually assigned Defendant new tasks under the overarching MTOA2 contract awarded to Plaintiff, with Defendant submitting its work time weekly, as well as monthly invoices for Plaintiff's employee Edgmon to approve. **Doc. 99 Ex. C at 73:9-17; 163:19-25, 164:1-15.** The Court concludes that this evinces a series of interconnected dealings with the intent for continued assignments within the meaning of an open account as ascribed by *Heron*. *Heron v. Gaylor*, 1942-NMSC-023 at ¶ 6; *See also Wolf & Klar Cos. v. Garner*, 1984-NMSC-040, ¶ 4, 101 N.M. 116, 117, 679 P.2d 258, 259 (holding that the parties had an open account whereby one party "received thirty separate invoices, and a statement showing the status of the account every month from May 1977 through December 1980, [] sufficient to permit the trial court to find that an open account existed between the parties."). The Court is unconvinced by Plaintiff's mostly off-topic response, which, in the relevant part, argues that each task was to be considered a single, separate transaction. **Doc. 200.**

## II.     The Court Rejects the Parties' Requests to Strike

The Court instructed Defendant to submit additional briefing solely on the issue of an open account. In its Brief, Defendant included a lengthy response to Plaintiff's status report (**Doc. 193**) detailing discrepancies it found therein and urging the Court to strike Plaintiff's report. The Court has already stated that Plaintiff's status report was essentially nonresponsive to the Court's

directive and is satisfied this was sufficient. **Doc. 196.** Similarly, Plaintiff issued a response in which it requested the Court strike Defendant's supplemental briefing, for sanctions and attorney's fees. **Doc. 200.** Reserving only a few paragraphs at the end to comment on the issue of the open account counterclaim, Plaintiff's Brief is merely a recitation of various arguments and accusations regarding issues already decided by the Court on multiple occasions. Accordingly, the Court rejects Plaintiff's request as well.

### III.     The Court Orders a Briefing on Whether a Jury Trial on Damages is Required

Considering the parties' ongoing disputes, the Court believes that ordering a settlement conference would yield little value and waste judicial resources. Thus, the Court would like to proceed to address damages as to Defendant's counterclaims.

**THEREFORE, IT IS ORDERED** that the parties **shall file briefing within fourteen (14) days of the entry of this order on whether a jury trial is required to resolve the issue of damages.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment as to Defendant's counterclaim for an open account/account stated **(Doc. 98)** is **GRANTED.**

**IT IS SO ORDERED.**

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE