IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ENVIRONMENTAL DIMENSIONS, INC.,

    Plaintiff,

v.                                                                                                                           No. 1:16-cv-1056-KWR-JHR

ENERGYSOLUTIONS GOVERNMENT
GROUP, INC. (n/k/a Atkins Energy
Government Group, Inc.),

    Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING
SUMMARY JUDGMENT ON DEFENDANT'S DAMAGES**

THIS MATTER comes before the Court following the Court's prior order (**Doc. 205**), filed on November 13, 2020, in light of the Court's decision to treat Defendant's brief on the resolution of damages as a motion for summary judgment. **Doc. 203.** Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendant's motion is well-taken and, therefore, is **GRANTED**.

**BACKGROUND**[1]

The claims arise from a dispute involving a nuclear waste remediation project the parties worked on together at Los Alamos National Lab ("LANL"). Plaintiff is in the business of providing environmental resources and radioactive waste management and containment support to the U.S. Department of Energy and other government agencies. The company is managed predominately by its Vice President, Michael Bradshaw ("Bradshaw"). Plaintiff engaged in a

---

[1] The Court incorporates the following factual background from findings in its preceding MOO's, which are taken largely from undisputed facts cited by Defendant and supported in the record. *See* Docs. 167, 168, 188 and 202. As the Court provides in this Memorandum and Opinion Order, Plaintiff also fails to cite to the record in disputing these facts.

bidding process for qualification to contract with Los Alamos National Security, LLC ("LANS") to perform transuranic waste remediation work at LANL.  Defendant provides nuclear waste remediation and personnel support and worked with LANL previously on other projects.  Prior to submitting its bid, Plaintiff executed a Teaming Agreement with Defendant on July 12, 2011, specifying the duties and responsibilities of the parties should the bid be accepted.  The Agreement includes that, "[i]n any event, EnergySolutions' share will be a minimum of 35% of the total contract labor value earned in performance of the life cycle of the anticipated contract issued by LANS."  The Agreement contains an additional provision that "[e]xcept as expressly provided … all rights and obligations of the parties under this Agreement shall terminate on the earliest of the following: … e. Execution by both parties of the subcontract contemplated by this Agreement." (Doc. 99 Ex. G).

When Plaintiff was subsequently awarded the contract, denominated as Master Task Order Agreement 2 ("MTOA2"), it subcontracted with Defendant and two other companies to carry out the work.  Plaintiff executed the subcontract with Defendant in August 2013, which incorporated the language of the Teaming Agreement guaranteeing Defendant a 35% minimum share of the labor.  The subcontract further provided that "[p]ayments shall be issued to Subcontractor after receipt and approval of Subcontractor's invoices by EDi and within 10 days of receipt of payment from the [LANS]."

Through a series of modifications, Defendant was authorized to bill up to $3,500,000 for completed work.  At no time did Defendant exceed this amount. Work began on the project in July 2014. Plaintiff's employees, project manager Chris Edgmon ("Edgmon") and COO/VP of business development John Rodell ("Rodell")[2] were tasked with coordinating the work on a day-to-day

---

[2] It is unclear what Rodell's exact title is, but the record reflects that Edgmon deferred to him and he made final decisions regarding the project on a day-to-day basis.

basis.  Edgmon was responsible for, among other things, scheduling work, budgeting, and approving invoices submitted by the subcontractors, which in turn were submitted to Rodell for review and approval.  Bradshaw had little involvement in the day-to-day operations of the project, and most decisions were largely left to Edgmon and Rodell.

Defendant took on a larger role than the other subcontractors in performance of the work, consequently billing for a larger share than the minimum 35% expressed in the Teaming Agreement and the subcontract.  It is undisputed that Defendant only carried out work authorized by Plaintiff; that Defendant submitted six invoices dating from March 10 - August 11, 2015 amounting to $1,057,354.63, for which it was not paid; and that Plaintiff submitted invoices to LANS for the same work and received payment.  On May 12, 2015, Bradshaw sent a letter of cure to Defendant stating it was not in compliance with the terms of the Teaming Agreement and that "[i]n spite of repeated attempts by EDi to realign the staffing to meet the TA [Teaming Agreement] goals, Energy*Solutions* continued refusal has forced us to take action… [i]f this matter is not resolved by Friday May 15, 2015, any work [going forward] performed by Energy*Solutions* above and beyond 35% is done so solely at Energy*Solutions'* risk." (Doc. 113 Ex. 2).  After Bradshaw's letter, Plaintiff continued to assign work to Defendant, which it performed until the underlying Task Order was terminated by LANS on May 27, 2015.

Plaintiff originally sued Defendant raising, among other claims, breach of contract and violation of New Mexico's Unfair Trade Practices Act. Plaintiff largely attributed LANS' choice to terminate the project and perform more work internally as a punitive measure in response to Defendant's alleged misconduct during the February 14, 2014 "WIPP incident," when an

basis.  Edgmon was responsible for, among other things, scheduling work, budgeting, and approving invoices submitted by the subcontractors, which in turn were submitted to Rodell for review and approval.  Bradshaw had little involvement in the day-to-day operations of the project, and most decisions were largely left to Edgmon and Rodell.

Defendant took on a larger role than the other subcontractors in performance of the work, consequently billing for a larger share than the minimum 35% expressed in the Teaming Agreement and the subcontract.  It is undisputed that Defendant only carried out work authorized by Plaintiff; that Defendant submitted six invoices dating from March 10 - August 11, 2015 amounting to $1,057,354.63, for which it was not paid; and that Plaintiff submitted invoices to LANS for the same work and received payment.  On May 12, 2015, Bradshaw sent a letter of cure to Defendant stating it was not in compliance with the terms of the Teaming Agreement and that "[i]n spite of repeated attempts by EDi to realign the staffing to meet the TA [Teaming Agreement] goals, Energy*Solutions* continued refusal has forced us to take action… [i]f this matter is not resolved by Friday May 15, 2015, any work [going forward] performed by Energy*Solutions* above and beyond 35% is done so solely at Energy*Solutions'* risk." (Doc. 113 Ex. 2).  After Bradshaw's letter, Plaintiff continued to assign work to Defendant, which it performed until the underlying Task Order was terminated by LANS on May 27, 2015.

Plaintiff originally sued Defendant raising, among other claims, breach of contract and violation of New Mexico's Unfair Trade Practices Act. Plaintiff largely attributed LANS' choice to terminate the project and perform more work internally as a punitive measure in response to Defendant's alleged misconduct during the February 14, 2014 "WIPP incident," when an

improperly packaged waste drum packaged by Defendant at LANL, while working on another project[3], underwent an exothermic reaction and burst, causing a radiological release.

## RELEVANT PROCEDURAL HISTORY

On November 8, 2019, the Court denied Defendant's Motion for Summary Judgment on its Counterclaims (November Order) for, *inter alia*, breach of contract, or in the alternative, breach of covenant of good faith and fair dealing and unjust enrichment. Defendant seeks damages in the amount of $1,057,354.63; the total of payments withheld by Plaintiff for the work Defendant performed. *See* Memorandum Opinion and Order (**Doc. 158**). The Court did not reach the merits of the majority of Defendant's claims, denying the motion instead because, although Defendant's argument was "persuasive," it sought payment for work performed after the issuance of Bradshaw's May 12 letter, as opposed to work completed solely beforehand. This case was subsequently transferred to the undersigned. On February 11, 2020, the undersigned granted Defendant's motion for summary judgment on Plaintiff's claims for breach of contract and fraud, and on February 14, 2020, granted Defendant's motion for partial summary judgment on Plaintiff's New Mexico Unfair Trade Practices claim, thereby disposing of Plaintiff's remaining claims. On April 30, 2020, the Court granted Defendant's Motion for Reconsideration (**Doc. 188**), thereby granting summary judgment on Defendant's counterclaim for breach of contract and alternatively for unjust enrichment. The Court did not reach the merits of Defendant's other counterclaims. On July 6, 2020, in accordance with Defendant's status report request, the Court addressed the remaining counterclaims, ruling in Defendant's favor but deferring with respect to its counterclaim for an open account/account stated. **Doc. 196.** Pursuant to Fed. R. Civ. P. 56 (f) (1), the Court

---

[3] Defendant operated as the prime contractor on that project; Plaintiff was not involved in and was not a party to that project.

provided Defendant's notice that it may grant summary judgment in favor of Plaintiff on this counterclaim and provided the Defendant an opportunity to respond. *Id.*

On October 28, 2020 the Court granted summary judgment on Defendant's remaining counterclaim for an open account/account stated. **Doc. 202.** The Court directed the parties to file briefing within fourteen (14) days of the entry of that order on whether a jury trial is required to resolve the issue of damages. On November 11, 2020, Defendant filed briefing with the Court **(Doc. 203)** and Plaintiff, while not in compliance with the Court's directive, filed a "Notice and Statement of Plaintiff on Defendant's Counterclaim" **(Doc. 204)** to the effect that the company no longer exists and has no assets.

Defendant's brief advised the Court that a jury trial was unnecessary in light of the invoices establishing the exact amount owed and requested the Court find that Defendant is entitled to $1,041,531.74 in principal damages, exclusive of pre and post-judgment interest and attorneys' fees.[4] In light of Defendant's brief and Plaintiff's nonresponsive "Notice," the Court decided to treat Defendant's brief **(Doc. 203)** as a motion for summary judgment on damages. Accordingly, the Court directed Plaintiff to respond within **fourteen (14) days** of the entry of that order. **Doc. 205.** Plaintiff was instructed to file briefing specifically with disputes as to facts and citation to the record and cautioned that should it fail again to specifically dispute Defendant's assertions of fact with citation to the record, the Court may deem Defendant's facts undisputed. The Court notified the parties that failure to comply might result in sanctions, including dismissal or entry of default. *Id.* **at 2.**

## LEGAL STANDARD

---

[4] Defendant provided that "[Defendant] uses the term "principal damages" throughout [the brief] because it intends to file motions for pre- and post-judgment interest as well as attorneys' fees. It is not intended to indicate that ESGG seeks any other type of damages that would require submission to a jury." **Doc. 203 at 2 fn 2.** Plaintiff has since filed such briefing, which the Court intends to address separately. **Doc. 206.**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 922 F.3d 1033, 1036 (10th Cir. 1993) (citations omitted). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

A fact is material if it could have an effect on the outcome of the suit. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the nonmoving party. *EEOC v. Horizon/CMS Heathcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). A court is to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). A court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and thus, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

**DISCUSSION**

**I.      Plaintiff Has not Complied with the Court's Instruction**

As detailed in the preceding section of this Memorandum Opinion and Order, Plaintiff was expressly directed to respond to the summary judgment motion with disputes as to facts with

citation to the record. Plaintiff's response to Defendant's statement of facts (**Doc. 203**) consists of 21 paragraphs. Plaintiff first objects to all of Defendant's statement of facts as "failing to meet the standard of evidence such that there is a genuine issue of material fact requiring this case proceed to trial. *See* Fed. Rule Civ. P. [56]. All of Defendants statements refer to dicta in the Court's order and not findings of fact or to the record." **Doc. 208 at 2.** Plaintiff also contends that Defendant's evidence refers to the Court's Memorandum Opinion and Orders rather than the record and is thus impermissible. However, Plaintiff's Response fails to adhere to the Court's very specific directive in that it proffers unsubstantiated factual arguments and does not cite to the record throughout the majority of its brief, warranting outright rejection pursuant to the Court's warning. Nevertheless, the Court will briefly address the content.

Preliminarily, Plaintiff's initial objection that Defendant has not met the standard of evidence is not enough to raise a factual dispute, and the Court finds that Defendant has adequately supported the facts by citation to the record.[5] Plaintiff's subsequent paragraphs 1-4 dispute Defendant's facts by citing to the Complaint. This is insufficient. Plaintiff's remaining paragraphs either admit Defendant's assertions or dispute them without citation to the record at all and are therefore deemed admitted. F.R.C.P. 56 (e)(3). With respect to Plaintiff's argument as to the six unpaid invoices for which Defendant seeks relief, the Court rejects Plaintiff's assertion that there is no support in the record to demonstrate that Plaintiff "was actually paid for the work…". **Doc. 208 at 4 ¶ 21**. Plaintiff does not cite anywhere in the record in support and the Court has already determined multiple times, without Plaintiff disputing or providing evidence to the contrary, that Defendant only carried out work authorized by Plaintiff; that Defendant submitted six invoices

---

[5] In some instances, Defendant has cited to factual determinations rendered by the Court in its prior Memorandum Opinions and Orders. *See e.g.* Doc. 203 at 4 ¶¶ 5-8. However, those sections of the Court's Orders cited by Defendant do themselves cite directly to the record, are quoted directly from the parties contract or have otherwise been determined as indisputable by the Court.

dating from March 10 - August 11, 2015 amounting to $1,041,531.74$^6$; that Plaintiff submitted invoices to LANS for the same work and collected payment, after which it did not pay Defendant. **Docs. 167 at 2-3; 168 at 3; 188 at 3; 202 at 3.** Defendant provided citation to the exhibits containing the invoices, the portions of invoices where Plaintiff's employee Edgmon had signed and written "Approved" along with the date, as well as testimony of Plaintiff's employees affirming that Plaintiff invoiced and collected payment from LANS for that work,. *See* **Doc. 99 Ex. C, 166:1–6; Ex. D, 127:20–128:19; Exs. L-R**. The Court finds disingenuous Plaintiff's efforts to create issues by attempting to discredit its own witnesses, arguing that Defendant's rely upon testimony of Plaintiff's employees and its Vice President Bradshaw, "5 years after the fact, which is not the best evidence." **Doc. 208 at 4-5 ¶ 21**. Throughout the action, Plaintiff had no issue attempting to use Bradshaw's testimony in support of its position. This sort of baseless argument typifies Plaintiff's response. The Court concludes that there are no genuine issues of material fact remaining and that Defendant is entitled to $1,041,531.74 in principal damages.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment on principal damages is granted.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment **(Doc. 203)** on damages in the amount of $1,041,531.74 is hereby **GRANTED**.

---

[6] The Court originally found that the unpaid, invoiced amounts totaled $1,057,354.63. However, Defendant seeks damages for a lesser amount of $1,041,531.74, explaining that LANS did not approve certain payments requested in one invoice relating to severance pay for Defendant's employees, resulting in a lower approved amount. *See* **Doc. 203 at 5 fns. 3 and 8.**

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE

9